# Supreme Court of Texas

No. 22-0481

Campbellton Road, Ltd.,

*Petitioner*,

v.

City of San Antonio by and through
the San Antonio Water System,

*Respondent*

On Petition for Review from the
Court of Appeals for the Fourth District of Texas

**Argued November 30, 2023**

JUSTICE DEVINE delivered the opinion of the Court.

Justice Lehrmann did not participate in the decision.

The Local Government Contract Claims Act waives immunity from suit for breach of contract when a local governmental entity enters into certain written contracts, including those "stating the essential terms of the agreement for providing . . . services to" that entity.[1]  In

---

[1] TEX. LOC. GOV'T CODE §§ 271.151(2)(A), .152.

this breach-of-contract suit to enforce alleged vested rights in sewer-flow capacity, the issue on appeal is whether a written instrument documenting the terms and conditions for a municipal water system to provide sewer service to and guarantee capacity for a developer's planned subdivisions formed a contract for which the Act waives immunity. Central to the dispute are the terms of an option for the developer to participate in and fund the construction of off-site oversized infrastructure, which the system would then own to ensure sufficient capacity for the new developments. The court of appeals concluded the Act did not apply, and therefore did not waive immunity, because there was no agreement for providing services to the system; that is, the system had no contractual right to receive any services and would not have "any legal recourse" if the developer "unilaterally decided not to proceed."[2]

We disagree and hold that the Act waived the system's immunity from suit because the developer adduced evidence that (1) a contract formed when the developer decided to and did participate in the off-site oversizing project, (2) the written contract states the essential terms of an agreement for the developer to participate in that project, and (3) the agreement was for providing a service to the system that was neither indirect nor attenuated. We therefore reverse the court of appeals' judgment and remand the case to the trial court for further proceedings.

---

[2] 647 S.W.3d 751, 759 (Tex. App.—San Antonio 2022).

# I. Background

In 2003, Campbelton Road, Ltd. (the Developer)[3] and San Antonio Water System (SAWS) signed an Outer Service Area Sewer Service Contract.[4] The Contract identifies SAWS as the City of San Antonio's water, wastewater, and water re-use agency and the City as the responsible government agency for constructing, operating, and maintaining the sewerage system in a defined area. Outside city limits but within the service area,[5] the Developer owned a 585-acre tract of land, which it planned to develop into two residential subdivisions with sewer service. To this end, the Contract recites that SAWS's collection and treatment of the tract's wastewater are in the public interest and that the parties wished to document the agreement's terms regarding such services.[6]

---

[3] Although the Contract, pleadings, and docket list "Campbellton Road, Ltd.," the Developer now informs us that the correct spelling is "Campbelton."

[4] The manager for the Developer's predecessor in interest and SAWS's director of infrastructure development signed the Contract on behalf of the respective parties after SAWS's board of trustees approved it by resolution.

[5] *See* TEX. LOC. GOV'T CODE § 395.001(9) (defining "service area" to include the area within a political subdivision's corporate boundaries or extraterritorial jurisdiction "to be served by the capital improvements or facilities expansions specified in the capital improvements plan").

[6] Development agreements often provide "the benefits of certainty and predictability" in addressing property development issues, including the funding of necessary infrastructure to serve new developments. R. Alan Haywood & David Hartman, *Legal Basics for Development Agreements*, 32 TEX. TECH. L. REV. 955, 956 (2001) (noting that development agreements allow developers "to obtain a binding commitment from the city for those services on which the landowner/developer, and its lenders and purchasers, may rely" while helping the city "plan for those utility services," as it "will typically need to know and will specifically want to limit the extent of that commitment"); *see* Ronald H. Rosenberg, *The Changing Culture of American Land Use*

The Contract states that it would "remain in full force and effect" for ten years. Among other terms and conditions, the Developer would submit a project master plan, engineering report, and water plan and comply with design, construction, and permitting procedures for sewer-infrastructure development. Off-site systems would be considered temporary facilities until SAWS's director of infrastructure development determined they were "an integral part of [SAWS]'s regional sewerage system." After SAWS accepted the infrastructure, the Developer would convey its "right, title and interest" to it, and SAWS "shall thereafter own, operate, and maintain said systems" with "the right to connect wastewater flows from other developments."[7]

Before the development can be connected to SAWS's sewer service, the Contract requires the Developer to pay sewer-collection and wastewater-treatment components of an impact fee,[8] to be calculated in

_Regulation: Paying for Growth with Impact Fees_, 59 SMU L. REV. 177, 203 (2006) ("Modern American land regulation has consistently and increasingly relied on land developers to build or fund basic improvements and infrastructure within property subdivisions they initiate, as well as requiring that they contribute to off-site capital improvements necessitated by their developments.").

[7] SAWS's Utility Service Regulations correspondingly require that "upon inspection and written acceptance for maintenance by SAWS, title to all water and wastewater mains, lift stations, force mains and wastewater treatment plants must be granted to SAWS," "[w]hether a developer installs the infrastructure at the developer's cost or SAWS installs it under a developer contract." San Antonio Water System, UTILITY SERVICE REGULATIONS § 4.6 (Feb. 18, 2003) (hereinafter, SAWS REGS.). After SAWS issues a final acceptance certificate, "the facilities become SAWS property free and clear of all liens, claims and encumbrances." _Id._ § 4.8.

[8] The collection component "enables SAWS to fund or recover its investment in wastewater collection and outfall mains, permanent lift stations, force mains and related facilities installed to serve new customers," while the

4

accordance with the fees in effect at the time of plat recordation.[9] Impact fees are means by which a governmental entity may recoup the costs of necessary capital improvements to serve a new development.[10] Once the Developer satisfied the initial payment obligation, SAWS would then charge monthly fees for treatment and disposal of the tract's flows.

The Contract sets the maximum average daily flow from the tract at 450,000 gallons per day, which equals 1,500 equivalent dwelling units (EDUs), a standardized measure based on wastewater use attributable to a single-family residence.[11] Before plat approval, however, SAWS's director would "make a final determination" of the maximum allowable flow capacity but "may not reduce the capacity" below 1,500 EDUs if the Developer materially complied with its contractual obligations. And by paying "the collection and/or treatment" impact fees, the Developer

---

treatment component "enables SAWS to fund or recover its investment in wastewater treatment facilities installed to serve new customers." *Id.* § 2.1.

[9] Alternatively, the impact fees may be calculated in accordance with the fees in effect on "the latest date allowable by law." The Contract lists estimates of the impact fees at $366 per equivalent dwelling unit (EDU) for the collection component and $750 per EDU for the treatment component. *See id.* (defining an EDU as "[a] standardized measure" of the "wastewater attributable to a single family residence").

[10] *See* TEX. LOC. GOV'T CODE § 395.001(4) ("'Impact fee' means a charge or assessment imposed by a political subdivision against new development in order to generate revenue for funding or recouping the costs of capital improvements or facility expansions necessitated by and attributable to the new development.").

[11] *See* SAWS REGS. § 2.1. According to the Contract, "[o]ne EDU equates to 300 GPD [gallons per day] of average flows, and 750 peak GPD per EDU for sizing of mains."

would acquire vested rights to the capacity. On the other hand, if the Developer had not "completed construction of the off-site line and/or not paid all impact fees required herein [in] order to earn vested rights and collection component credits" before the ten-year term ended, the parties agreed in the Contract that SAWS would continue to accept flows from the tract, recognize the Developer's right to any unused capacity, and apply any impact-fee credits to which the Developer was entitled.

At the time the parties signed the Contract, SAWS was planning a wastewater consolidation system for the Southside Independent School District to serve the schools and surrounding developments. Given the potential wastewater flows from the Developer's nearby tract, the Contract states that SAWS expected to include in its construction bid an alternative oversize option for the sewer infrastructure—lift stations and force mains[12]—at two schools to increase SAWS's flow capacity (the Southside project). The Developer "must decide if [it] wish[es] to participate" and be responsible for the share of the costs to build the oversize option. But it had to decide "within 2 weeks of bid opening" without "interrupt[ing] the project schedule," pay its share "to SAWS prior to contract award," and be responsible for costs related to any relevant change orders. If the Developer did not elect to participate, it would be responsible for only the engineering fees related to preparing the oversize option and, presumably, SAWS would bid the construction of only the base model.

---

[12] Lift stations and force mains, as their names imply, are designed to pump sewage where "gravity wastewater mains are not practical or economically feasible." *Id.* § 11.4.1.

6

In exchange for its participation, the Developer would be eligible under the Contract for collection impact-fee credits for its cost share.[13] These credits "attach to the real estate" and could be used to satisfy some, or all, of the collection component of assessed impact fees,[14] depending on whether the credits exceeded the assessed amount. The Contract states that the collection component of the impact fees "may currently be estimated . . . at $366.00 Per EDU" (in other words, $549,000 for 1,500 EDUs). SAWS also would be obligated to supply sewer service "upon completion of the oversized project" and "acceptance of an impact fee" without "the construction of a specific facility to provide such sewer service, other [than] the [Southside] Project." But because the Southside project would not connect to the subdivisions, the Developer would remain responsible for the costs, easements, permitting, and construction of connecting infrastructure.

The record indicates that the Developer decided to participate in the Southside project and paid its share of the costs—according to the Developer, it "spent millions." But the Developer acknowledged in its

---

[13] SAWS's regulations define "Impact Fee Credit" as "[a] dollar value earned pursuant to section 15.9 of the regulations and credited against the payment of water and wastewater impact fees." *Id.* § 2.1. "These credits will be earned based upon the portion of the total as-built construction cost of the project funded by the developer customer including engineering fees up to ten percent." *Id.* § 15.9. The credits "will not have an expiration date," "may be transferred to another development owned by the same developer," and "must be used at the time of platting." *Id.* Credits for impact fees are authorized under Section 395.019 of the Local Government Code.

[14] The collection credits could not be applied to the treatment component of the impact fees. Under the Contract, the "Developer shall be assessed and required to pay the entire treatment component of the sewer impact fee in effect at the time of fee payment."

pleadings that it did not develop the subdivisions within the Contract's ten-year term. Instead, it waited until 2019—six years after the term ended—to "commence development" and reach out to SAWS regarding the 1,500-EDU capacity. Noting that the capacity had been set aside for ten years,[15] SAWS responded that it now had no unused capacity. SAWS offered to execute a new utility-service agreement with the Developer to allocate capacity for the subdivisions but would require either further upgrades to the Southside project or the construction of an alternative lift structure for connection. SAWS estimated that to supply 1,500 EDUs, the necessary upgrades would cost $7.7 million.

After an unsuccessful administrative appeal,[16] the Developer sued the City by and through SAWS for breach of contract, seeking both money damages and specific performance to supply the Developer with a capacity of 1,500 EDUs.[17] The Developer alleged that by participating in the Southside project and earning collection credits, it had acquired a

[15] *See id.* § 15.6 ("For a customer who has a utility service agreement, SAWS will recognize its commitment to set-aside water and wastewater system capacity in infrastructure servicing the tract for the time period the agreement is in effect.").

[16] SAWS's rationale for denying the administrative appeal was that the "Developer never paid the impact fees or drew down on impact fee credits earned" and the Developer had the sole "power and control to actually develop its tract and pay sewer collection and treatment impact fees within the 10 year term . . . to earn guaranteed service capacity in the project."

[17] The Developer also sought a declaration (plus attorney's fees) that one of SAWS's regulations did not apply to the Contract. The regulation provided that previously issued sewer contracts that do not have an expiration date would remain valid for a period of fifteen years from February 18, 2003. The court of appeals concluded that governmental immunity was not waived for this claim, 647 S.W.3d 751, 762-64 (Tex. App.—San Antonio 2022), and the Developer does not challenge that portion of the judgment in this Court.

8

vested right to the capacity and that SAWS breached the Contract by allocating the capacity to others.[18] In response, SAWS asserted its governmental immunity in a plea to the jurisdiction and then took an interlocutory appeal from the trial court's order denying the plea.[19]

The court of appeals reversed, concluding that the Act did not waive SAWS's governmental immunity because the Contract was not an agreement for providing goods or services to SAWS.[20] Relying primarily on our opinion in *Lubbock County Water Control & Improvement District v. Church & Akin, L.L.C.*,[21] the court of appeals held: (1) the Contract's purpose was for the Developer to *receive* services from SAWS; (2) SAWS, on the other hand, had no right to receive any services under the Contract and no legal recourse if the Developer "unilaterally decided not to proceed with the developments and not complete any provisions of the contract"; (3) the Contract does not require SAWS to purchase any

[18] The Developer argues that through its collection credits, it paid the relevant "collection and/or treatment" impact fees to acquire a vested right because the "and/or" means "*and* or *or*" and the treatment component was never assessed. As explained in Part II.B, we do not reach the merits of this argument.

[19] *See* TEX. CIV. PRAC. & REM. CODE § 51.014(8) (providing for an interlocutory appeal from the denial of a plea to the jurisdiction by a governmental unit).

[20] 647 S.W.3d at 759, 764. The court of appeals remanded with instructions to dismiss the cause and determine an award of attorney's fees and costs to the prevailing party under the Uniform Declaratory Judgments Act. *Id.* at 764; *see supra* note 17.

[21] 442 S.W.3d 297, 304-05 (Tex. 2014). The court of appeals also relied on its precedent interpreting *Lubbock County*. 647 S.W.3d at 761-62 (citing *CHW-Lattas Creek, L.P. v. City of Alice*, 565 S.W.3d 779, 788-89 (Tex. App.—San Antonio 2018, pet. denied), *disapproved of on other grounds by City of League City v. Jimmy Changas, Inc.*, 670 S.W.3d 494, 501-02 (Tex. 2023)).

services from the Developer; (4) the purpose of the Southside project was not "for the direct benefit of SAWS" but for the benefit of the Developer's subdivisions; and (5) any benefit SAWS received was indirect and not part of the agreement's essential terms.[22]

The Developer petitioned this Court for review, which we granted.

## II. Discussion

The Developer does not dispute that SAWS is a governmental entity entitled to immunity. The jurisdictional question here, one we review de novo,[23] is whether the Developer satisfied its burden to establish, or at least raise a fact issue on, a waiver of that immunity.[24] The Developer relies on the waiver of immunity in Section 271.152 of the Local Government Code. Although the statute unquestionably waives immunity, the question is whether the Developer's breach-of-contract suit falls within its ambit.

In determining the scope of a statutory waiver of immunity, we apply traditional principles of statutory interpretation to ascertain and effectuate legislative intent as manifested in the enacted language.[25] To

---

[22] 647 S.W.3d at 759-62.

[23] *Fraley v. Tex. A&M Univ. Sys.*, 664 S.W.3d 91, 97 (Tex. 2023).

[24] *See Lubbock Cnty.*, 442 S.W.3d at 305. Governmental immunity is a form of sovereign immunity that applies to political subdivisions. *Brown & Gay Eng'g, Inc. v. Olivares*, 461 S.W.3d 117, 121 (Tex. 2015). Sovereign immunity implicates a court's subject-matter jurisdiction, but the two are not coextensive for all purposes. *Gulf Coast Ctr. v. Curry*, 658 S.W.3d 281, 284 n.2 (Tex. 2022); *see Rattray v. City of Brownsville*, 662 S.W.3d 860, 867 (Tex. 2023) ("One key reason that we use the 'jurisdictional' label [for sovereign immunity] is because it reflects the judicial obligation to adjudicate only those claims that are authorized without trespassing on the authority of the political branches.").

[25] *EBS Sols., Inc. v. Hegar*, 601 S.W.3d 744, 749 (Tex. 2020).

10

the extent the analysis also requires interpreting the parties' contract, our primary objective is similarly to ascertain and give effect to their "true intentions as expressed in the language they chose."[26]

## A. The Local Government Contract Claims Act

We begin with a brief overview of governmental immunity and the Act. Before 2005, "governmental immunity shielded a local government from enforcement of its contract obligations."[27] Justified on "political, pecuniary, and pragmatic" grounds,[28] the doctrine protects the public from the costs and consequences of their government's improvident actions and allows the Legislature to be the arbiter of when tax resources should be shifted "away from their intended purposes toward defending lawsuits."[29] In the contract context, the doctrine "ensures that current policymakers are neither bound by, nor held accountable for, policies underlying their predecessors' long-term contracts."[30]

---

[26] *Rieder v. Woods*, 603 S.W.3d 86, 94 (Tex. 2020) (quoting *Plains Expl. & Prod. Co. v. Torch Energy Advisors Inc.*, 473 S.W.3d 296, 305 (Tex. 2015)).

[27] *San Antonio River Auth. v. Austin Bridge & Rd., L.P.*, 601 S.W.3d 616, 622 (Tex. 2020).

[28] *Rosenberg Dev. Corp. v. Imperial Performing Arts, Inc.*, 571 S.W.3d 738, 740 (Tex. 2019).

[29] *Hays St. Bridge Restoration Grp. v. City of San Antonio*, 570 S.W.3d 697, 703-04 (Tex. 2019) (quoting *Tex. Nat. Res. Conservation Comm'n v. IT-Davy*, 74 S.W.3d 849, 854 (Tex. 2002)).

[30] *Catalina Dev., Inc. v. County of El Paso*, 121 S.W.3d 704, 706 (Tex. 2003) (quoting *IT-Davy*, 74 S.W.3d at 854).

11

As a common-law doctrine, the judiciary determines governmental immunity's initial applicability.[31] But it is the Legislature's province to balance the policy considerations in determining when to waive immunity and to what extent.[32] We defer to the Legislature, as the people's representative body, so that it may "protect its policymaking function," "respond to changing conditions," and "revise existing agreements if doing so would benefit the public."[33] To ensure "this legislative control is not lightly disturbed," we look to statutory law to determine if the Legislature has clearly and unambiguously waived governmental immunity.[34]

In 2005, the Legislature waived immunity for certain breach-of-contract suits,[35] "alter[ing] decades of one-sided bargains, in which local governments were wholly immune from breaches of their obligations."[36] Section 271.152 delineates when immunity is waived:

> A local governmental entity that is authorized by statute
> or the constitution to enter into a contract and that enters

---

[31] *Hays St. Bridge*, 570 S.W.3d at 703.

[32] *Lubbock Cnty. Water Control & Improvement Dist. v. Church & Akin, L.L.C.*, 442 S.W.3d 297, 300-01 (Tex. 2014).

[33] *Tooke v. City of Mexia*, 197 S.W.3d 325, 332 (Tex. 2006) (quoting *IT-Davy*, 74 S.W.3d at 854).

[34] *Id.* at 332-33; *see* TEX. GOV'T CODE § 311.034 (requiring statutory waivers to be "effected by clear and unambiguous language").

[35] *See* Act of May 23, 2005, 79th Leg., R.S., ch. 604, § 2, 2005 Tex. Gen. Laws 1548 (codified at TEX. LOC. GOV'T CODE §§ 271.151–.160). The waiver applies retroactively "to claims based on contracts executed before the statute's effective date." *City of Dallas v. Albert*, 354 S.W.3d 368, 372 (Tex. 2011).

[36] *San Antonio River Auth. v. Austin Bridge & Rd., L.P.*, 601 S.W.3d 616, 625 (Tex. 2020).

12

into a contract subject to this subchapter waives sovereign immunity to suit for the purpose of adjudicating a claim for breach of the contract, subject to the terms and conditions of this subchapter.[37]

The parties' dispute turns on whether SAWS entered into "a contract subject to this subchapter," which the Act defines to include "a written contract stating the essential terms of the agreement for providing goods or services to the local governmental entity that is properly executed on behalf of the local governmental entity."[38] Three components of this definition are at issue in this appeal: whether (1) the Contract constitutes "a written contract" (2) that states "the essential terms of the agreement" (3) "for providing . . . services" to SAWS.[39]

### 1. "a written contract"

We first consider the threshold requirement to establish a waiver of governmental immunity under the Act: the existence of a written contract.[40] To constitute "a written contract," an agreement must be reduced to writing and satisfy the basic requirements of contract formation,[41] although it need not "ultimately be enforceable to clear the

---

[37] TEX. LOC. GOV'T CODE § 271.152.

[38] *Id.* § 271.151(2)(A).

[39] Because SAWS signed and adopted the Contract by resolution, the parties do not dispute whether the Contract was "properly executed on behalf of the local governmental entity." *See id.*; *supra* note 4.

[40] *See City of Denton v. Rushing*, 570 S.W.3d 708, 711 (Tex. 2019).

[41] *See El Paso Educ. Initiative, Inc. v. Amex Props., LLC*, 602 S.W.3d 521, 534 n.66 (Tex. 2020) ("[F]or an 'agreement' to be subject to section 271.152's waiver of immunity, it must, of course, be a contract."); *City of Denton*, 570 S.W.3d at 713 ("For governmental immunity to be waived under [the Act], there must first be an enforceable, written contract."); *City of*

13

jurisdictional hurdle."[42] If the formation requirements are not satisfied, there is no contract for a governmental entity to "enter[]," regardless of any written instrument purporting to be a contract.[43]

Generally, "the formation of a contract requires a bargain in which there is a manifestation of mutual assent to the exchange and a consideration."[44] Expanding on the court of appeals' holding that the Developer could have unilaterally decided not to complete any provisions of the Contract,[45] SAWS challenges whether the Contract

_____

*Houston v. Williams*, 353 S.W.3d 128, 135, 143 (Tex. 2011) (noting that the written contract must satisfy "the basic requirements of contract law").

[42] *Amex Props.*, 602 S.W.3d at 534 n.66; *see* TEX. LOC. GOV'T CODE § 271.155 ("This subchapter does not waive a defense or a limitation on damages available to a party to a contract, other than a bar against suit based on sovereign immunity."); TEX. R. CIV. P. 94 (listing contract-avoidance defenses); RESTATEMENT (SECOND) OF CONTRACTS § 8 cmt. b (AM. LAW INST. 1981) (describing types of unenforceable contracts).

[43] *See, e.g.*, *Williams*, 353 S.W.3d at 135, 143 (assuaging fears that ordinances will waive immunity under the Act by noting "this fear overlooks the basic requirements of contract law—just as with any writing alleged to be a contract, an ordinance can only be enforced as a contract in a court of law if it satisfies the requirements of a contract").

[44] RESTATEMENT (SECOND) OF CONTRACTS § 17(1) (AM. LAW INST. 1981); *id.* § 3 ("A bargain is an agreement to exchange promises or to exchange a promise for a performance or to exchange performances."); *see Fed. Sign v. Tex. S. Univ.*, 951 S.W.2d 401, 408 (Tex. 1997) ("A contract must be based upon a valid consideration, in other words, mutuality of obligation."). Certain contracts, including formal contracts, may be subject to special rules that do not require a bargain or consideration. *See, e.g.*, *1/2 Price Checks Cashed v. United Auto. Ins. Co.*, 344 S.W.3d 378, 385 n.20 (Tex. 2011) (noting that a formal contract "includes unique formation requirements inapplicable to simple contracts" while "the requirements for informal or simple contracts, such as consideration and mutual assent, 'are generally inapplicable to formal contracts'" (quoting 1 WILLISTON ON CONTRACTS § 1:1 (4th ed. 2007))).

[45] 647 S.W.3d 751, 759 (Tex. App.—San Antonio 2022).

satisfies these formation requirements. According to SAWS, because the Developer's performance of developing the tract and connecting to SAWS's sewer system was optional, the Contract constitutes only a "unilateral option agreement that [the Developer] had the opportunity to accept by performance within ten years," and a unilateral contract "would not form until [the Developer] fully performed, which never occurred."[46] The Developer disputes this characterization, arguing that the Contract is bilateral (with some unilateral aspects) but even if not, the Developer's actual participation in the Southside project formed a contract.

Typically, parties enter into a written contract through signing a document,[47] and subsequent performance—like participation in the

---

[46] A unilateral contract occurs "'when there is only one promisor and the other accepts . . . by actual performance,' rather than by the usual mutual promises" exchanged in a bilateral contract. *Williams*, 353 S.W.3d at 136 (quoting *Vanegas v. Am. Energy Servs.*, 302 S.W.3d 299, 302 (Tex. 2009)). "A unilateral contract becomes enforceable when the promisee performs" because "[t]he requirement of mutuality is not met by an exchange of promises; rather, the valuable consideration contemplated in 'exchange for the promise is something other than a promise,' i.e., performance." *Id.* (quoting RESTATEMENT OF CONTRACTS § 12 cmt. a (AM. LAW INST. 1932)); *see Sunshine v. Manos*, 496 S.W.2d 195, 198 (Tex. Civ. App.—Tyler 1973, writ ref'd n.r.e.) ("Where a contract is unilateral on its face, it does not come into existence as a binding contract until the [offeree] has performed, or at least partly performed, his duties under the agreement. Prior to that time, it is nudum pactum and may be revoked by the offeror at any time."); *Nudum Pactum*, BLACK'S LAW DICTIONARY (11th ed. 2019) ("An agreement that is unenforceable as a contract because it is not 'clothed' with consideration.").

[47] *See Baylor Univ. v. Sonnichsen*, 221 S.W.3d 632, 635 (Tex. 2007) ("Evidence of mutual assent in written contracts generally consists of signatures of the parties and delivery with the intent to bind."). *But see, e.g.*, *Amex Props.*, 602 S.W.3d at 532 (noting that because certain charter schools operate pursuant to statute, "they may enter into a contract only in the manner

---

Southside project—would not be relevant to whether a contract is subject to the Act.[48]  But for unilateral contracts, considering subsequent performance may be necessary to determine whether a contract was formed and when the governmental entity "enter[ed] into" it.[49]  In *City of Houston v. Williams*, for example, we considered whether city ordinances that promised firefighters overtime and termination pay in exchange for their services and "required acceptance by performance" constituted a contract subject to the Act.[50]  We noted that "a unilateral employment contract is created when an employer promises an employee certain benefits in exchange for the employee's performance, *and the employee performs*."[51]  Because the firefighters accepted the city's promised terms through their subsequent performance, we held that the ordinances "constitute a unilateral contract that became effective and enforceable as to these retired Firefighters who have completed the requested performance."[52]

Here, however, we need not decide whether the Contract was a unilateral option agreement or a bilateral contract at the time the parties signed it.  The Developer proffered evidence that it decided to

---

the legislature has authorized," and "[i]t is not enough, then, that [their] representative signs a contract").

[48] *See Lubbock Cnty. Water Control & Improvement Dist. v. Church & Akin, L.L.C.*, 442 S.W.3d 297, 304 (Tex. 2014) (noting that the written agreement's terms "determine[] whether immunity is waived").

[49] *See* TEX. LOC. GOV'T CODE § 271.152.

[50] 353 S.W.3d 128, 136-38 (Tex. 2011).

[51] *Id.* at 136 (emphasis added).

[52] *Id.* at 143.

16

participate in and performed on the Southside project, thereby showing that a contract would have formed through either acceptance or actual performance of the option to participate.

In the Contract, SAWS promised the Developer an option to participate in the Southside project. If it "decide[d]" to participate "within 2 weeks of bid opening," the Developer would be prohibited from interrupting the project schedule, obligated to pay its share of the oversizing costs "prior to contract award," and responsible for its cost share of any change orders. In return, the Developer would be eligible for collection credits that it could use to satisfy a portion, or all, of its collection impact fees. Obligations also extended beyond the Contract's term whether or not the Southside project was completed: SAWS would continue to accept wastewater flows, recognize a right to remaining unused capacity, and apply the Developer's impact-fee credits.[53] Both sides exchanged promises regarding their respective obligations related to the option, and SAWS would "enter[] into" that contract on its formation through the Developer's acceptance of the option.[54]

---

[53] SAWS asserts that this Contract provision memorializes "the default positions SAWS takes toward any customer." But SAWS does not cite any evidence to support this claim. And in denying the administrative appeal, SAWS stated that "*[p]ursuant to*" this Contract provision, it "would have continued to permit the Developer to connect [after the ten-year term] so long as: [(]i) the Developer paid all impact fees required under the Contract; and (ii) there remained unused project capacity." (Emphasis added.)

[54] *See Courseview, Inc. v. Phillips Petroleum Co.*, 312 S.W.2d 197, 207 (Tex. 1957) (noting that an option becomes a bilateral contract when accepted by the optionee); *cf. Pitman v. Sanditen*, 626 S.W.2d 496, 498 (Tex. 1981) (holding that "a binding, bilateral contract is formed" when a tenant under a lease exercises an option to purchase contained in the lease).

17

Alternatively, SAWS's unilateral-contract theory leads to a similar result. If the Developer performed by participating in and funding the Southside project, SAWS's putative unilateral offer would become a unilateral contract.[55] Even if the project constituted only partial performance of the Contract as a whole, the Contract imposes legal obligations on SAWS based on the Developer's performance on the Southside project, including that the Developer would be eligible for collection credits.[56]

In the lower courts, it was undisputed that the Developer decided to participate in and timely completed the Southside project.[57] The Developer also attached to its response to SAWS's plea to the jurisdiction an email exchange between SAWS and an engineer stating that the oversized design for the Southside project "was chosen, funded

---

[55] *See Williams*, 353 S.W.3d at 138 (noting that promises to compensate firefighters were "a unilateral contract that became binding when the Firefighters performed").

[56] *See Hutchings v. Slemons*, 174 S.W.2d 487, 489 (Tex. [Comm'n Op.] 1943) (holding that partial performance rendering services or expenses contemplated at the time a contract was made, even though the contract was void for lack of mutuality, will render the entire contract valid and enforceable); *Frequent Flyer Depot, Inc. v. Am. Airlines, Inc.*, 281 S.W.3d 215, 224-25 (Tex. App.—Fort Worth 2009, pet. denied) ("[E]ven if an illusory promise renders a contract unilateral, consideration can still be established by part performance by the promisee."); *Sunshine v. Manos*, 496 S.W.2d 195, 199 (Tex. Civ. App.—Tyler 1973, writ ref'd n.r.e.) ("The decisions in this state, however, seem to indicate that partial performance of a unilateral contract is sufficient to make the same a binding contract.").

[57] *See* 647 S.W.3d 751, 763 (Tex. App.—San Antonio 2022) ("It is undisputed that before the provisions of the contract expired on June 6, 2013, [the Developer] completed construction of the off-site facilities as required by the contract.").

by the Developer & constructed." Under our standard for reviewing plea-to-the-jurisdiction evidence that implicates the merits of the case, this evidence satisfies the initial inquiry of whether SAWS entered into a written contract.[58]

We reiterate that this jurisdictional hurdle does not require proof of the contract's ultimate enforceability; rather, it is sufficient for a plaintiff to raise a fact issue on the formation of the written contract.[59] Clearing this initial hurdle is merely an opening move for a plaintiff to have its day in court, a move that does not require rigorous proof, the marshaling of all evidence, or conclusively establishing one's claim.[60] Because the Developer has met this threshold burden, we turn now to "the terms of the written agreement"—"the substance that determines whether immunity is waived."[61]

---

[58] Our review parallels that of a summary judgment: we "view the evidence in a light favorable to the nonmovant, indulging reasonable inferences from that evidence in the nonmovant's favor." *Fraley v. Tex. A&M Univ. Sys.*, 664 S.W.3d 91, 97 (Tex. 2023).

[59] *El Paso Educ. Initiative, Inc. v. Amex Props., LLC*, 602 S.W.3d 521, 534 n.66 (Tex. 2020).

[60] *See Rattray v. City of Brownsville*, 662 S.W.3d 860, 868 (Tex. 2023) ("The rigor of proof required to satisfy a court that jurisdiction [based on waiver of immunity] is present increases at each stage of litigation, as with disputes over traditional subject-matter jurisdiction."); *Alamo Heights Indep. Sch. Dist. v. Clark*, 544 S.W.3d 755, 805 (Tex. 2018) ("The plaintiff is not required to marshal all her evidence and conclusively prove her claim to satisfy this jurisdictional hurdle.").

[61] *Lubbock Cnty. Water Control & Improvement Dist. v. Church & Akin, L.L.C.*, 442 S.W.3d 297, 304 (Tex. 2014).

## 2. "stating the essential terms of the agreement"

For a written contract to be "subject to" the Act, it must state "the essential terms of the agreement."[62] The Developer primarily relies on the written terms related to its option to participate in the Southside project. SAWS does not dispute the existence of any "essential" terms—the "basic obligations" to participate "are clearly outlined" in the Contract.[63] Rather, citing *Lubbock County*, SAWS argues, and the court of appeals held, that there was no "agreement" to participate for two primary reasons: (1) SAWS had no contractual right to the Developer's participation at the time the parties signed the Contract; and (2) the Contract contained no terms requiring SAWS to pay the Developer.[64] In considering each of these arguments, we clarify *Lubbock County*'s scope and conclude that neither reason prevails here.

---

[62] TEX. LOC. GOV'T CODE § 271.151(2)(A).

[63] *See Kirby Lake Dev., Ltd. v. Clear Lake City Water Auth.*, 320 S.W.3d 829, 838 (Tex. 2010) ("The Agreements here are written contracts stating their essential terms. The names of the parties, property at issue, and basic obligations are clearly outlined."); *see also Dall./Fort Worth Int'l Airport Bd. v. Vizant Techs., LLC*, 576 S.W.3d 362, 369 (Tex. 2019) (noting that whether terms are essential "depends on the specific contract" and if the parties would reasonably regard them as "'vitally important ingredient[s]' of their bargain" (quoting *Fischer v. CTMI L.L.C.*, 479 S.W.3d 231, 237 (Tex. 2016))).

[64] *See* 647 S.W.3d 751, 759-62 (Tex. App.—San Antonio 2022). The court of appeals and SAWS also relied on these arguments to claim that the Contract provides only an "indirect, attenuated" benefit to SAWS. *See Lubbock Cnty.*, 442 S.W.3d at 303 (noting that the Act "would not extend to 'contracts in which the benefit that the local governmental entity would receive is an indirect, attenuated one'" (quoting *Kirby Lake*, 320 S.W.3d at 839)). Although the contingent nature of an agreement's terms may inform that question, whether the essential terms were agreed to is a distinct analytical inquiry.

In *Lubbock County*, we considered whether a lessee agreed to provide marina-operation services to a water district when a lease provision required the district's premises "*to be used* only as a Lake marina."[65] Although we noted that both parties "may have contemplated that [the lessee] would operate a marina," we recognized the distinction between restricting the use of property to a specific purpose, which imports no obligation to use the premises, and requiring the use of property for a specific purpose.[66] In concluding that the use-restriction provision was not an agreement to provide services, we explained, "When a party has no right under a contract to receive services, *the mere fact* that it may receive services as a result of the contract is insufficient to invoke [the Act's] waiver of immunity."[67]

The court of appeals construed *Lubbock County* as requiring an enforceable contractual right to the provision of services in the first instance.[68] In the usual case, a contract subject to the Act would provide this contractual right. But *Lubbock County* left open the possibility that something more than the "mere fact" that services may be received could trigger the Act's waiver, even if there was no enforceable contractual right in the first instance.[69] Our approach was faithful to the statutory

---

[65] 442 S.W.3d 297, 303 (Tex. 2014).

[66] *Id.*

[67] *Id.* (emphasis added).

[68] *See* 647 S.W.3d at 759, 761-62 (concluding the Act did not apply because "[u]nder the contract, SAWS had no right to receive services" and no "legal recourse" if the services were not provided).

[69] To the extent courts of appeals have restrictively construed *Lubbock County* to preclude this possibility, we disapprove them. *See, e.g., Big Blue*

21

language: the Act does not require a "written contract that *is* an agreement for providing . . . services"[70] but a contract that *states* the essential terms of an *agreement* for providing services.[71] An "agreement" is "a manifestation of mutual assent."[72] Although mere contemplation of services being performed, as in *Lubbock County*, is not "a manifestation of mutual assent" to service terms,[73] an "agreement" does not necessarily create an enforceable contractual right to those services at the time those terms are stated and in the first instance.[74]

---

*Props. WF, LLC v. Workforce Res., Inc.*, No. 02-21-00135-CV, 2022 WL 1793516, at *3 (Tex. App.—Fort Worth June 2, 2022, pet. denied) (noting that the "affirmative act" of service "must be required by the written contract"); *W. Travis Cnty. Pub. Util. Agency v. Travis Cnty. Mun. Util. Dist. No. 12*, 537 S.W.3d 549, 555 (Tex. App.—Austin 2017, pet. denied) (noting that "the governmental entity must in the first instance have a *right* under the contract to receive services"); *see also CHW-Lattas Creek, L.P. v. City of Alice*, 565 S.W.3d 779, 788-89 (Tex. App.—San Antonio 2018, pet. denied) (citing *Lubbock County* and *West Travis*), *disapproved of on other grounds by City of League City v. Jimmy Changas, Inc.*, 670 S.W.3d 494, 501-02 (Tex. 2023).

[70] *Lubbock Cnty.*, 442 S.W.3d at 302.

[71] TEX. LOC. GOV'T CODE § 271.151(2)(A).

[72] RESTATEMENT (SECOND) OF CONTRACTS § 3 (AM. LAW INST. 1981); *see id.* § 5 ("A term of a promise or agreement is that portion of the intention or assent manifested which relates to a particular matter.").

[73] *See* 442 S.W.3d at 303 (holding that "although both parties may have contemplated" the operation of a marina, this was insufficient for the Act's waiver to apply).

[74] *See, e.g.*, RESTATEMENT (SECOND) OF CONTRACTS § 3 cmt. a (AM. LAW INST. 1981) ("Agreement has in some respects a wider meaning than contract" because "[t]he word 'agreement' contains no implication that legal consequences are or are not produced"—for example, it applies to transactions "that are wholly executory."); 1 WILLISTON ON CONTRACTS § 1:19 (4th ed. 2007) ("An 'executory contract' is one in which the promisee's rights do not

Our case law confirms this. In *Williams*, the city ordinances stated the terms for firefighters to provide services, but the city did not have an enforceable contractual right to their services. And after the terms were mutually assented to—through the firefighters' performance—and a unilateral contract had been formed, the city had already received the services.[75] The contract was subject to the Act even though the city never had an enforceable contractual right to receive those services.

Nor must a contractual right necessarily be enforceable in the first instance. Consider, for example, a contract that satisfies formation requirements but predicates service obligations on certain conditions precedent. "Conditions precedent to an obligation to perform are those acts or events, *which occur subsequently to the making of a contract*, that must occur before there is a right to immediate performance and before there is a breach of contractual duty."[76] Such a contract would state

---

immediately come into existence but are conditioned upon some further performance, usually by the promisee.").

[75] *See City of Houston v. Williams*, 353 S.W.3d 128, 138 (Tex. 2011) (noting that the unilateral contract "became binding when the Firefighters performed").

[76] *Allstate Ins. Co. v. Irwin*, 627 S.W.3d 263, 270 (Tex. 2021) (quoting *Hohenberg Bros. Co. v. George E. Gibbons & Co.*, 537 S.W.2d 1, 3 (Tex. 1976)); *see id.* ("A condition precedent may be either a condition to the formation of a contract or to an obligation to perform an existing agreement." (quoting *Dillon v. Lintz*, 582 S.W.2d 394, 395 (Tex. 1979))); *see also James Constr. Grp., LLC v. Westlake Chem. Corp.*, 650 S.W.3d 392, 404 (Tex. 2022) ("'A condition precedent is an event that must happen or be performed before a right can accrue to enforce an obligation.' 'If the condition is not fulfilled, the contract or obligation attached to the condition cannot be enforced.'" (internal citations omitted) (quoting *Solar Applications Eng'g, Inc. v. T.A. Operating Corp.*, 327

terms for providing services that were agreed to, even if the contractual right was not immediately enforceable.

We need not spell out the precise contours of these distinctions here. As we have already explained, the acceptance of the Developer's option to participate would create a contractual right to its participation and share of the costs. And under SAWS's unilateral-contract theory, the Developer's actual performance would have provided the necessary manifestation of mutual assent, as the firefighters' performance in *Williams* did. One way or another, the record indicates that the parties agreed to the terms of the Developer's participation in the Southside project at the relevant time of contract formation.

We next consider SAWS's argument regarding the absence of a payment provision. In *Lubbock County*, we found further support for our conclusion that the parties did not mutually assent to the provision of services because the lease contained no terms in which the district agreed to pay "any amount" for the lessee to provide marina-operation services.[77] We also noted that the Act limited recoverable damages to "'the balance due and owed by the local governmental entity under the

---

S.W.3d 104, 108 (Tex. 2010), and *CDI Eng'g Grp., Inc. v. Admin. Exch., Inc.*, 222 S.W.3d 544, 548 (Tex. App.—Houston [14th Dist.] 2007, pet. denied))).

[77] 442 S.W.3d at 305; *see Fischer v. CTMI, L.L.C.*, 479 S.W.3d 231, 240 (Tex. 2016) ("'The failure of the parties to reach some understanding as to price often indicates that there has been no meeting of the minds,' and 'a contract which does not fix the price or consideration or provide an adequate way in which it can be fixed is too incomplete to be specifically enforceable.'" (quoting *Bendalin v. Delgado*, 406 S.W.2d 897, 899 (Tex. 1966))).

24

contract,' plus attorney's fees and interest."[78]  Construing the Act's immunity waiver in light of this damages limitation, we recognized that the "waiver will typically apply only to contracts in which the governmental entity agrees to pay" for the services.[79]

But the absence of a payment provision is not dispositive.  We held that it "*may indicate* that the claimant did not in fact agree to provide" the services.[80]  And we also noted that a party may agree to provide services "in exchange for something other than payment."[81]  Moreover, since *Lubbock County*, we have (1) recognized that the Act's damages limitation did not preclude specific performance as a remedy[82] and (2) broadly interpreted the statutory phrase "the balance due and owed" to mean "the amount of damages for breach of contract payable and unpaid," even if the amount is not "stated in," "expressly provided for in," or even "ascertainable from" the contract.[83]  *Lubbock County* and its progeny instruct that the absence of an express money-payment provision, standing alone, must not be given too much weight in

---

[78] *Lubbock Cnty.*, 442 S.W.3d at 304 (quoting TEX. LOC. GOV'T CODE § 271.153(a)(1)(3)).

[79] *Id.*

[80] *Id.* at 305 (emphasis added).

[81] *Id.*

[82] *Hays St. Bridge Restoration Grp. v. City of San Antonio*, 570 S.W.3d 697, 707-08 (Tex. 2019).

[83] *Zachry Constr. Corp. v. Port of Hous. Auth.*, 449 S.W.3d 98, 111-12, 114 (Tex. 2014); *see Kirby Lake Dev., Ltd. v. Clear Lake City Water Auth.*, 320 S.W.3d 829, 840 (Tex. 2010) ("The purpose of section 271.153 is to limit the amount due by a governmental agency on a contract once liability has been established, not to foreclose the determination of whether liability exists.").

determining whether contracting parties agreed to service terms, so long as the service terms are "sufficiently definite to 'enable a court to understand the parties' obligations,' and to give 'an appropriate remedy' if they are breached."[84]

In marked contrast to *Lubbock County*, there is no dispute here that the parties agreed to and expressly chose a method of exchange— collection credits—for the Developer's participation.[85] These collection credits could be used to satisfy the assessed collection impact fee, which the Contract estimates would cost $549,000 for 1,500 EDUs. SAWS nevertheless alleges that these credits "do not provide financial value" because credits and impact fees are a functionally equivalent and interchangeable means of ensuring a developer of new property bears the cost of the necessary infrastructure to serve that development.[86] In the abstract and from a regulatory perspective, SAWS may be correct. In practice and from a developer's perspective, however, the credits and fees are not equivalent. By agreeing to be eligible for collection credits that could then be used to satisfy impact fees, the Developer exercised greater control over when it would expend resources to fund off-site

---

[84] *Fischer v. CTMI, L.L.C.*, 479 S.W.3d 231, 237 (Tex. 2016) (quoting *Fort Worth Indep. Sch. Dist. v. City of Fort Worth*, 22 S.W.3d 831, 846 (Tex. 2000), and RESTATEMENT (SECOND) OF CONTRACTS § 33(2) (AM. LAW INST. 1981)).

[85] *See Lubbock Cnty.*, 442 S.W.3d at 304-05 ("This lease agreement contains no terms in which the Water District agreed to pay [the lessee] any amount for its services, so there is no amount that is 'due and owed [from the district to the lessee] under the contract.' Instead, [the lessee] agreed to pay the Water District for a leasehold interest in the property.").

[86] *See* TEX. LOC. GOV'T CODE § 395.019 (describing how impact fees may be collected in areas where services are not currently available).

infrastructure while receiving a guarantee that additional off-site infrastructure construction would not be necessary.[87] The Contract also expressly contemplates that the collection credits could exceed the assessed collection impact fees.[88] And under SAWS's regulations, these credits would not expire and are transferrable "to another development owned by the same developer."[89] Given this, we disagree that the credits provide the Developer with no value.

In sum, the Contract states the essential terms for the Developer to participate in the Southside project, the parties manifested mutual assent to those terms through the Developer's participation, and the parties agreed that the Developer would be eligible for collection credits in exchange for its participation.

### 3. "agreement for providing . . . services" to SAWS

Although the Contract states the essential terms of an agreement for the Developer to participate in the Southside project, it would not be subject to the Act unless the agreement was for providing services to SAWS.[90] We have taken a broad view of what "services" encompasses,

---

[87] As previously noted, the Developer's right to SAWS's sewer service would not require "the construction of a specific facility to provide such sewer service, other [than] the [Southside] Project."

[88] The Contract provides that the Developer would earn collection credits if its share of the costs for the Southside project "is greater than the assessed amount of the sewer collection component of the impact fee."

[89] *See supra* note 13. The 2016 revisions to SAWS's regulations also allow credits earned under Section 15.9 to be transferred to another developer. San Antonio Water System, UTILITY SERVICE REGULATIONS § 15.9 (Feb. 9, 2016).

[90] *See* TEX. LOC. GOV'T CODE § 271.151(2)(A).

holding that it "includes generally any act performed for the benefit of another."[91]  The only limitation our case law imposes is that the services must provide more than a mere "'indirect, attenuated' benefit."[92]

In our analogous decision in *Kirby Lake Development, Ltd. v. Clear Lake City Water Authority*, we addressed whether certain agreements for developers to construct water and sewer facilities according to a water authority's specifications were for providing services to the authority.[93]  The agreements also stipulated that the developers would lease the facilities to the authority free of charge until the authority—if it received voter-approved bond funds—purchased them by partially reimbursing construction costs.[94]  In considering those services, we cited with approval a court of appeals' decision that an "agreement to hire third parties to construct the Facilities and to build the streets, roads, and bridges is . . . sufficient to constitute the provision of services to the authority."[95]  Drawing on this holding, we concluded that the agreements entailed "services provided directly to" the authority.[96]

---

[91] *San Antonio River Auth. v. Austin Bridge & Rd., L.P.*, 601 S.W.3d 616, 629 (Tex. 2020) (quoting *Kirby Lake Dev., Ltd. v. Clear Lake City Water Auth.*, 320 S.W.3d 829, 839 (Tex. 2010)).

[92] *Id.* (quoting *Kirby Lake*, 320 S.W.3d at 839).

[93] 320 S.W.3d at 832, 838-40.

[94] *Id.* at 832-33.

[95] *Id.* at 839 (quoting *Clear Lake City Water Auth. v. Friendswood Dev. Co.*, 256 S.W.3d 735, 751 (Tex. App.—Houston [14th Dist.] 2008, pet. dism'd), *disapproved of on other grounds by Rusk State Hosp. v. Black*, 392 S.W.3d 88, 95 (Tex. 2012)).

[96] *Id.*

Similarly, the Developer here agreed to the terms to participate in and fund the construction of off-site oversized lift stations and sewer mains—capital improvements[97]—according to SAWS's specifications. After determining the capital improvements would "be an integral part of [SAWS]'s regional sewerage system" and accepting them, SAWS would own the infrastructure and generate revenue through monthly service fees in servicing the developments with this capacity.[98] If there was any unused capacity, SAWS had the contractual right "to connect wastewater flows from other developments" and could use the infrastructure to service other developments and generate additional revenue, as it apparently did after the ten-year term passed. And by exchanging collection credits for participation, SAWS received the benefit of having its capital improvements financed at the time of construction without the up-front expenditure of governmental funds.[99]

No doubt, the services to SAWS were not the central purpose of the Contract, which states that the Southside project was "to accommodate flows from the [Developer's] development." But we have repeatedly emphasized that the agreement to provide services need not

---

[97] *See* TEX. LOC. GOV'T CODE § 395.001(1)(A) (defining "capital improvement" to include "wastewater collection and treatment facilities").

[98] *See Byrdson Servs., LLC v. S. E. Tex. Reg'l Plan. Comm'n*, 516 S.W.3d 483, 488 (Tex. 2016) (noting the important "factual" but not "fateful" distinction that "in *Kirby Lake* the parties contemplated that the governmental entity would ultimately own the facilities constructed by the developers").

[99] *See* Tex. Att'y Gen. Op. No. GA-0788, at 3 (2010) (noting that impact-fee credits are "a method to finance capital improvements in a new development without up-front expenditure of governmental funds").

be the "primary purpose,"[100] provided the benefits to the governmental entity are "sufficiently direct and concrete."[101]  Although the *Kirby Lake* homeowners—and not the governmental entity—were "arguably the ultimate beneficiaries of the developers' efforts to build water and sewer facilities," this circumstance did not take those contracts outside the Act's scope.[102]  So too here.  On this plea-to-the-jurisdiction record, when the Developer participated in the Southside project and a contract formed, the agreement's benefits to SAWS were sufficiently direct and concrete for the Contract to fall within the Act's scope.

*   *   *

Because the Developer adduced evidence that SAWS entered into a written contract that states the essential terms of an agreement for providing services to SAWS, the trial court correctly denied SAWS's plea to the jurisdiction.  The court of appeals erred in concluding otherwise.

**B. Dilatory Plea**

Finally, SAWS broaches the merits in this appeal, challenging whether the Developer acquired a vested right to the 1,500 EDUs.  We express no opinion on this matter.  A dilatory plea's purpose "is to defeat a cause of action without regard to whether the claims asserted have

---

[100] *Kirby Lake*, 320 S.W.3d at 839; *Lubbock Cnty. Water Control & Improvement Dist. v. Church & Akin, L.L.C.*, 442 S.W.3d 297, 302 (Tex. 2014).

[101] *Byrdson Servs.*, 516 S.W.3d at 487.

[102] *Id.* (discussing *Kirby Lake*, 320 S.W.3d at 839).

merit," "not to force the plaintiffs to preview their case on the merits."[103] When an authorized local governmental entity enters into a contract subject to the Act, immunity from suit is waived "for the purpose of adjudicating a claim for breach of the contract,"[104] but "[t]he waiver does not depend on the outcome."[105] Here, the Developer has "plead[ed] facts with some evidentiary support that constitute a claim for which immunity is waived" and has shown that it is entitled, at least for now, to its day in court against SAWS.[106]

## III. Conclusion

For these reasons, we reverse the court of appeals' judgment and remand the case to the trial court for further proceedings consistent with this opinion.

John P. Devine
Justice

**OPINION DELIVERED:** April 12, 2024

---

[103] *Wheelabrator Air Pollution Control, Inc. v. City of San Antonio*, 489 S.W.3d 448, 453 (Tex. 2016) (quoting *Bland Indep. Sch. Dist. v. Blue*, 34 S.W.3d 547, 554 (Tex. 2000)).

[104] TEX. LOC. GOV'T CODE § 271.152.

[105] *Zachry Constr. Corp. v. Port of Hous. Auth.*, 449 S.W.3d 98, 110 (Tex. 2014).

[106] *See id.*; *see also Kirby Lake*, 320 S.W.3d at 839 (noting that immunity may be waived under the Act even though "the part of the contract on which the plaintiff based its claim did not involve the provisions of good[s] or services to the local governmental entity" (quoting *Clear Lake City Water Auth. v. Friendswood Dev. Co.*, 256 S.W.3d 735, 746 n.13 (Tex. App.—Houston [14th Dist.] 2008, pet. dism'd), *disapproved of on other grounds by Rusk State Hosp. v. Black*, 392 S.W.3d 88, 95 (Tex. 2012))).